UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

GEORGE LOPEZ,

                                    Plaintiff,
                                                        9:11-CV-0418
v.                                                      (LEK/TWD)

D. BUSHEY, D. JOLICOEN[1]
C. GRIMSHAW, V. OLSEN,
W. HUNT, D. VENNE,
JOHN DOES 1-2,

                                    Defendants.
_____

APPEARANCES:                            OF COUNSEL:

HANCOCK ESTABROOK, LLP                  CHRISTOPHER R. SMITH, ESQ.
*Pro bono* Counsel for Plaintiff
1500 AXA Tower I
100 Madison Street
Syracuse, New York 13202

GEORGE LOPEZ, 01-A-5343
Plaintiff *pro se*
Gouverneur Correctional Facility
Scotch Settlement Road
P.O. Box 480
Gouverneur, New York 13642

HON. ERIC T. SCHNEIDERMAN               GREGORY J. RODRIGUEZ, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, New York 12224

---

[1]        The record in this case contains a variety of spellings for the name of Defendant
Jolicoen.  *Compare* Dkt. No. 1 ("Jolicoen") *with* Dkt. No. 11-3 ("Joliocouer") *and* Dkt. No. 45
("Jolicoeur").  In this Report-Recommendation, I have used the spelling listed on the docket.

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION and ORDER

In this prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, Plaintiff George Lopez ("Plaintiff") alleges in his Complaint that Defendants violated his Eighth Amendment rights by subjecting him to excessive force and then conspired to cover up the incident. (Dkt. No. 1.) Plaintiff pursued the action *pro se* through discovery. Defendants moved for summary judgment which was granted in part and denied in part. (Dkt. Nos. 53, 55.) All conspiracy claims were dismissed, but summary judgment was denied as to the excessive force claims. (Dkt. No. 55.) The Court then referred the case to the undersigned for a hearing to determine if Plaintiff properly exhausted his administrative remedies. *Id.* Thereafter, *pro bono* counsel for Plaintiff was assigned.[2] (Dkt. No. 56.) An evidentiary hearing was held on October 22, 2013, on the limited issues of whether administrative remedies were available to Plaintiff and whether Plaintiff's failure to exhaust may be excused by Plaintiff showing exhaustion unavailability, estoppel, or that special circumstances existed to justify the Plaintiff's failure to exhaust.

Based upon the evidence presented at the hearing, the Court finds that administrative remedies were available to Plaintiff, and he failed to properly and timely pursue those remedies. Specifically, the Court finds Plaintiff was not prevented by the actions of prison officials,

---

[2]     Attorney Christopher R. Smith, Esq., of the Hancock Estabrook, LLP Law Firm was appointed as *pro bono* counsel for Plaintiff on August 23, 2013. (Dkt. No. 56.) The Court expresses its gratitude to Attorney Smith for his selfless, zealous, learned and industrious representation on behalf of Plaintiff in this matter.

including the named Defendants, from filing grievances or from seeking all of his administrative remedies. Plaintiff's failure to pursue his administrative remedies encompasses his failure to file initial grievances and his failure to properly and timely appeal to the superintendent of the relevant prison and the Central Office Review Committee ("CORC"). The Court further finds that Plaintiff has not proved unavailability, estoppel or special circumstances necessary to provide a basis to excuse his failure to exhaust such remedies. Therefore, the Court recommends that Plaintiff's Complaint (Dkt. No. 1) be dismissed on this procedural basis, with prejudice, and without addressing its merits.

## I. FACTUAL BACKGROUND

Plaintiff George Lopez was in custody of the Department of Corrections and Community Supervision ("DOCCS"),[3] housed at Clinton Correctional Facility ("Clinton") from October 7, 2005, through January 9, 2006. (Dkt. No. 45-6 ¶ 4.) He alleges that on the afternoon of November 20, 2005, he was involved in an altercation with two other inmates. (Dkt. No. 1 at 5.) Officers broke up the fight and Defendants Hunt and Olsen escorted Plaintiff to a room in the facility's hospital. *Id.* There, Plaintiff alleges that Defendants Hunt, Olsen, Bushey, Jolicoen, Grimshaw, and Venne subjected him to excessive force using a night stick, their fists, and their feet. *Id.* Plaintiff alleges that Defendants stripped him naked after the initial beating. *Id.* at 6. Plaintiff alleges that Defendant Hunt then used six-inch institutional keys to penetrate Plaintiff's rectum while Defendants Venne and John Does 1-2 held Plaintiff down. *Id.*

In his Verified Complaint, Plaintiff alleges that he attempted to exhaust his administrative

---

[3] DOCCS was formerly known as the Department of Correctional Services ("DOCS"). It will be referred to as DOCCS herein regardless of the time frame referenced.

remedies regarding this incident, but that "prison officials hampered and interfered with his filing of a complaint with the Inmate Grievance Program ("IGP")."  (Dkt. No. 1 at 4.)  Specifically, Plaintiff alleges that "Sergeant Manos, . . . who happens to have keys to the Mail Box, looks through the Mail daily and, if he sees any Grievances, he will remove them and tear them up. Sergeant Manos will come to the inmate[']s cell with the Grievance and tear it in the inmate[']s face.  Hence that is why Plaintiff's mail never got to it[]s destination or his Grievances processed."  *Id*. at 9.  Plaintiff alleges that he "was able to file a complaint with the Inspector General's Office by having another inmate's family contact his family and passing a message which informed Plaintiff[']s family to contact the Inspector General's Office about the assault." *Id*. at 4.

## II.     HEARING TESTIMONY AND EVIDENCE

At the evidentiary hearing, the Court heard testimony from five witnesses for Defendants, including Karen Bellamy, Tara Brosseau, Darryl Menard, Tammy Irwin, and Mark Miller. Plaintiff George Lopez also testified on his own behalf.

### A.     Exhibits Received into Evidence

The Court received into evidence the following exhibits introduced by Defendants:

D-4.         Special Housing Unit ("SHU") Inmate Orientation Manual dated January 2005;

D-5.         SHU Sign In Log Book Entries;

D-6.         DOCCS' printout regarding Plaintiff's internal movement within DOCCS;

D-8.         February 1, 2006, letter from Thomas Eagan to Plaintiff;

D-9.         DOCCS' Directive 4040 dated 8/22/03 with Revision Notice date of 4/16/04;

D-11.        CORC's printout for list of grievances filed by Plaintiff;

D-12A.     Report of Interview from Inspector General's ("IG") Office dated 12/8/05, p. 1;

D-12B.     Report of Interview from IG's Office dated 12/8/05, p. 2;

D-13.     February 27, 2012, letter from AAG Gregory J. Rodriguez to Plaintiff;

D-14.     Plaintiff's opposition to Defendants' Motion for Summary Judgment; and

D-15.     April 3, 2012, letter from Plaintiff to AAG Gregory J. Rodriguez.

The Court received into evidence the following exhibits introduced by Plaintiff:

P-4.     November 28, 2005, handwritten Grievance; and

D-7.     January 2, 2006, letter from Plaintiff to CORC.

The testimony and evidence at the hearing focused upon the broad issue of exhaustion of administrative remedies. Specifically, Defendants argued that administrative remedies were available to Plaintiff, and that Plaintiff nevertheless failed to exhaust. Plaintiff countered that assertion by arguing exhaustion unavailability, special circumstances, and estoppel. The Court recounts the relevant evidence in the context of those specific showings.

### B.     Defendants' Initial Witnesses

#### 1.     Karen Bellamy

Karen Bellamy ("Bellamy") is the Director of the Inmate Grievance Program ("IGP") for DOCCS. (Dkt. No. 69 ("T") at 4.) She maintains records of grievances and appeals in the Central Office of DOCCS. *Id.* at 4-5. She identified DOCCS' Directive 4040 (Exhibit D-9) as the document outlining the IGP for all DOCCS' facilities that was in place during the relevant time period. *Id.* at 7. The relevant IGP is a three-step program whereby the inmate files the initial grievance with the Inmate Grievance Review Committee ("IGRC") within fourteen days of an alleged occurrence. *Id.* at 7- 9; *see also* Ex. D-9 If the inmate is unsatisfied with the decision

of the IGRC, the next step is for the inmate to request review by the superintendent of the facility. *Id*. at 7-9; *see also* Ex. D-9. If an inmate is still unsatisfied, the inmate must then appeal to CORC. *Id*.; *see also* Ex. D-9. If an inmate files a grievance related to staff misconduct, the IGP supervisor sends that grievance directly to the superintendent for investigation and response. *Id*. at 15. An inmate may not file a grievance with CORC without first filing with the IGRC and appealing to the superintendent. *Id*. at 9, 12-13. Once an inmate has followed all of the applicable steps, his administrative remedies will be exhausted. *Id*. at 7.

Bellamy reviewed the CORC database regarding Plaintiff and did not locate any appeal submitted to CORC by Plaintiff concerning a November 20, 2005, incident. *Id*. at 10; *see also* Ex. D-11. The CORC database search results did not show any active or closed appeals filed with CORC by Plaintiff. *Id.; see* Ex. D-11. However, a February 1, 2006, letter to Plaintiff from Thomas Eagan ("Eagan"), the previous Director of the IGP, was located. *Id*. at 11-12; Ex. D-8. Eagan indicated in that letter that the relevant facility administration did not have a record of a grievance from Plaintiff containing allegations of assault and abuse. *Id.*; *see also* Ex. D-8. Plaintiff was told that he could not refer a grievance directly to CORC and that he must submit his grievance to the grievance clerk at the relevant facility. *See* Ex. D-8.

### 2. Tara Brousseau

Tara Brosseau ("Brousseau") is employed by DOCCS as the IGP supervisor at Clinton. (T. at 24.) She oversees the IGP at the facility and processes all complaints and grievances in the office. *Id.* She reviews all grievances at Clinton, assigns them a title, code, and grievance number. *Id.* at 34. She confirmed that DOCCS' Directive 4040 (Ex. D-9) is the document that outlines the IGP for all DOCCS' facilities. *Id*. at 26. She described the three-step program as

outlined above and in Directive 4040.  *Id.*  If a grievance involves a claim of staff misconduct, harassment or discrimination, it receives the code of 49.  A copy with the grievance number assigned on it goes to the inmate, and the grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility.  *Id.* at 27, 34-35.  If the grievance is not a code 49, and the matter cannot be resolved informally, a hearing is conducted within seven days.  At the hearing, the inmate would is given a copy of the grievance with the grievance number on it.  *Id.* at 36.

Inmates in the general population at Clinton become familiar with the grievance process through an orientation where the process is explained to them, including an explanation of Directive 4040.  *Id.* at 45-46.  They are not given any grievance directions in writing.  *Id.*  If an inmate is housed in the SHU, they can either access the law library or get direction from the grievance sergeant who does rounds every week.  *Id.*  An inmate files an initial grievance by submitting it through the facility mail.  *Id.* at 27.  In the SHU, a lock box is brought around for all mail including grievances from inmates.  *Id*.  The mail is forwarded from the SHU to the correspondence office where it is sorted.  Grievances are forwarded to Brousseau's office.  *Id*.  There are specific grievance forms, but an inmate can submit a grievance on any type of paper.  *Id.*  Sergeant Menard, the SHU sergeant at the time of the relevant incident, had a key to the mail/grievance lock box.  *Id.* at 39.

Mechanisms are in place for inmates having difficulty getting a grievance filed.  *Id.* at 28-29.  An inmate can contact anyone from Brousseau's office, including her, or the inmate can talk to any executive staff member or officer about difficulties in filing a grievance.  *Id.* at 29.  The receiving staff member brings the grievance to Brousseau's attention and she makes sure

someone from her office speaks to the inmate. *Id.* The grievance sergeant also makes rounds in the SHU and inmates housed there can report any grievances or problems with the program to that officer. *Id.* at 48. The SHU sign in log book reveals that a grievance office sergeant, Sergeant Giambruno, visited the SHU within fourteen days after the incident of November 20, 2005. *Id.* at 47-48; *see also* Ex. D-5. Additionally, if an investigator from the IG's office is involved in an investigation, an inmate can report any grievance or problems with the grievance program to that investigator. *Id.* at 32.

Brousseau reviewed the grievance database at Clinton for the time period of October 2005 to January of 2006 to determine what, if any, grievances had been filed by Plaintiff at that facility. *Id.* at 30-31. She did not locate any grievances from Plaintiff, nor did she find any grievance regarding an incident of November 20, 2005. *Id.* Per Directive 4040 relevant at the time, inmates had fourteen days after an event to file a grievance, but extensions of up to thirty days after an event were regularly given based upon mitigating circumstances. *Id.* at 31-32.

### C.    Plaintiff's Testimony

Plaintiff was involved in an incident that occurred on November 20, 2005, after which he spent one day in the hospital followed by some time in the medical unit at Clinton. *Id.* at 54. He was then sent to the SHU. *Id.* He was not given any materials with which to write when in the SHU, and did not ask for them because officers threatened him, so he obtained materials from the inmate in the cell next to him. *Id.* at 55-57. At the hearing, he testified he wrote three grievances, but at his deposition he testified he wrote two grievances.[4] *Id.* at 59, 80-82. When he

---

[4]     In his opposition to the Defendants' motion for summary judgment, he claimed he submitted "a grievance." Ex. D-14 at ¶ 16.

tried to submit the grievances in the morning mail collection, they never were put in the mailbox because the Sergeant collecting the mail ripped up his grievances in front of him. *Id.* In earlier submissions to the Court, Plaintiff indicated he put the grievances in the mailbox but that they did not reach their destination. *Id.* at 83. He believed this staff member who collected the mail and ripped up his grievances was Sergeant Mano or Manos. At the hearing, however, Plaintiff identified him as Sergeant Menard. *Id.* at 57-59, 79, 81-83, 86-87, 152. He did not know the names of any staff member who threatened him except Sergeant Menard. *Id.* at 78. He also tried two or three times to submit grievances through his cell neighbor while in the SHU. *Id.* at 102, 106.

Plaintiff was aware of the grievance process and of Directive 4040 which outlines the process. *Id.* at 69, 93. He has submitted grievances "plenty of times." *Id.* He testified that no one from the IGRC ever came to his cell while he was in the SHU at Clinton, however, nor did anyone from IGRC announce themselves when on the unit. *Id.* at 60. He did not see other staff members or administrative staff members on the unit because he was on the floor of his cell and too weak to get up. *Id.* at 94-96. He wanted to get the grievance to somebody, but he did not want to talk to anyone about it. *Id.* at 97. He did speak to an investigator with the IG's office sometime, but did not recall when that conversation took place. *Id.* He did not recall if he complained to the investigator that someone was ripping up his grievances. *Id.* at 97, 107-109.

Plaintiff tried to file a grievance but was unable to because his mail was being ripped up and he was being threatened. *Id.* at 68. At the hearing, over an objection of Defendants' counsel that was based upon Plaintiff never having been produced the document during the years the years the case had been pending, Plaintiff submitted a document dated November 28, 2005,

which he claimed was the grievance he tried to submit at Clinton about the November 20, 2005, incident. *Id.* at 69-71, 91-92; *see also* Ex. P-4. He tried to submit that grievance, which did not contain any code or grievance number on it, to the superintendent on January 2, 2006. *Id.* at 64-65, 90-92, 107; *see also* Ex. P-4 and D-14 at ¶ 18. Plaintiff also sent a letter to CORC on January 2, 2006, which he claims included a copy of his November 28, 2005, grievance. *Id.* at 64; *see also* Ex. D-7. The letter to CORC did not indicate that his grievances were being ripped up, but that it was possible his "mail may not have reached it's destination." *Id.* at 88; *see also* Ex. D-7. The only response he received was from CORC which indicated that Clinton had no record of his grievance. *Id.* at 66; *see also* Ex. D-8. He never received a response from the superintendent and no one from the IGRC ever spoke to him about the grievance. *Id.* He believed his letters to the IGRC and the superintendent were either ripped up, not mailed correctly or did not make it to the intended recipient. *Id.* at 103. He claimed he gave the inmate in the next cell grievances to submit to Clinton for him, and that the other inmate mailed his letter to CORC for him. *Id.* at 67, 102-103.

### D. Defendants' Rebuttal Witnesses

#### 1. Tammy Irwin

Tammy Irwin ("Irwin") is a clerk in the legal office at Clinton whose duties include collecting documentation for lawsuits. *Id.* at 112. A superintendent/security file containing letters by inmates filed with the superintendent, and any kind of code 49 investigation documents, is maintained on inmates at Clinton. *Id.* at 113-114. Irwin searched for a file regarding Plaintiff and found only a copy of February 1, 2006, letter to Plaintiff from Thomas Eagen. The letter indicates by date stamp that it was received in the superintendent's office on

February 6, 2006.  *Id.* at 114-115; *see also* Ex. D-8.  Irwin did not find any letter from Plaintiff to the superintendent or any other correspondence in the superintendent/security file.  *Id.* at 113.

2.    Darryl Menard

Lieutenant Darryl Menard ("Menard") has worked for DOCCS for over 30 years.  *Id.* at 116.  In 2005 and 2006, he was the SHU sergeant on the day shift at Clinton working four days on and two days off.  *Id.* at 116-117.  Plaintiff arrived in the SHU on November 20, 2005.  *Id.* at 120; *see also* Ex. D-6.  At that time, when new inmates arrived in the SHU, they were given a verbal orientation which includes instructions about the grievance process.  *Id.* at 118-119. Inmates were notified that grievances were picked up with the mail and placed in the same mailbox.  *Id.*  Although the mail was picked up in the morning on his shift, Menard did not push the mail cart through the unit.  *Id.* at 120-122, 139.  However, he was responsible for opening the mailbox and placing the mail into a bag that was then delivered to the correspondence office of the facility.  *Id.* at 120-122, 127-129.  This was done in the common hallway area of the SHU where there are cameras.  *Id.*

At orientation, inmates were told that they could turn in a grievance to anyone on the staff making rounds, and that grievances did not have to be written on special forms.  *Id.* at 123; *see also* Ex. D-4 at p. 20.  Inmates were also given a SHU manual during orientation which included information about the IGP.  *Id.* at 119-120; *see also* Ex. D-4.  Inmates initially received a mini pen and writing paper, and a "legal cart" was brought around in SHU by the law library officer on a daily basis giving inmates an opportunity to obtain other items, including writing materials, forms, and law library requests.  *Id.* at 121-122.  The law library officer also collected the mail in the mailbox on that cart.  *Id.* at 127.

Unit counselors made rounds in the SHU every day, and other staff including nurses, chaplains, the grievance supervisor, and executive staff routinely made rounds in the SHU. *Id.* at 131-135. The SHU sign in log book showed that various staff members made visits to the SHU on a regular basis from November 20, 2005, to January 10, 2006. *Id.*; *see also* Ex. D-5. Inmates could give grievances to any of the staff making rounds including executive staff. *Id.* at 135-136. The SHU log book shows that grievance Sergeant Giambruno made rounds in the SHU from 7:30a.m. to 8:28a.m. on December 2, 2005. He was among many people who made rounds between November 2005 and January 2006. *Id.* at 135; *see also* Ex. D-5. Of note, the SHU log book shows Sergeant Giambruno was also on the unit as an escort on December 1, 2005. Ex. D-5.

### 3.     Mark Miller

Mark Miller ("Miller") works for DOCCS as the Deputy Inspector General. *Id.* at 143. In 2005, he worked as the Assistant Deputy Inspector General supervising investigators in the region where Clinton is located. *Id.* at 144. He reviewed the IG's file regarding Plaintiff which revealed an internal affairs investigation concerning the November 20, 2005, incident. *Id.* IG investigator Kevin Reichelt ("Reichelt") interviewed Plaintiff on December 8, 2005, and prepared a report of the interview. *Id.* at 144-145; *see also* Ex. D-12A and D-12B. The SHU log book confirms Reichelt was on the unit from 1:55p.m. to 2:20p.m. on that day. Ex. D-5. Reichelt's report does not indicate that Plaintiff complained of grievances being ripped up or destroyed by staff at Clinton. *Id.* at 146; *see also* Ex. D-12A and D-12B. The report indicates that Plaintiff was being threatened and "was embarrassed to say anything before seeing [the investigator]." Ex. D-12B. If Plaintiff had complained of grievances being destroyed, the

allegation would have been added to the investigation, and video of the location where the destruction occurred would have been reviewed for the relevant time and date to see if the destruction of grievances was occurring. *Id.* at 148. The investigator also looked for any grievances filed at the facility. *Id.* at 146-147.

## III. APPLICABLE LEGAL STANDARDS

### A. The Prison Litigation Reform Act of 1996

As succinctly outlined by my colleague, Magistrate Judge David E. Peebles:

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action . . . . Proper exhaustion requires a plaintiff to procedurally exhaust his or her claims by complying with the system's critical procedural rules. Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken.

*Bailey v. Fortier*, 09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *4, 2012 U.S. Dist. LEXIS 185178, at *11-13 (N.D.N.Y. Oct. 4, 2012) (citations and punctuation omitted).[5]

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to

---

[5] The Court will provide Plaintiff with copies of all unpublished decisions cited in this Order in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution in which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York State prisons, DOCCS has a well-established three-step inmate grievance program. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, DOCCS' IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days[6] of the alleged occurrence. *Id.* at § 701.5(a). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at 701.5(b)(1). If there is no informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*id*. at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. at 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the

---

[6] During the relevant time period involved in this case in November of 2005, grievances were to be filed within fourteen days of an occurrence. *See* Ex. D-9.

superintendent's written decision. *Id.* at 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at 701.5(d)(3)(ii).

An inmate may seek an extension of the time limits in writing at any of the steps, but such a request must be made within forty-five days of the incident being grieved or the decision being appealed. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g) (2013). If an inmate believes that an extension was wrongly denied, he may file a separate grievance protesting the denial. *Id.*

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93.

### B.      Burden of Proof at the Exhaustion Hearing - *Hemphill v. State of New York*

Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at *16 (N.D.N.Y. Mar. 31, 2010); *Bailey*, 2012 WL 6935254, at *6 (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence); *see also Andrews v. Whitman*, No. 06-2447-LAB (NLS), 2009 WL 857604, at *6, 2009 U.S. Dist. LEXIS 30017, at *16 (S.D. Cal. Mar. 27, 2009) (defendant must prove non-exhaustion of administrative remedies by a preponderance of the evidence).

If a defendant meets that burden, however, a plaintiff's failure to exhaust does not end the review. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative

remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)]."  *Murray,* 2010 WL 1235591, at *4.  *Hemphill* sets forth a three-part inquiry for district courts.  First, courts must determine if administrative remedies were in fact available to plaintiff.  In *Hemphill*, the Second Circuit acknowledged the existence of the DOCCS' grievance procedure [N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7] and stated that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill*, 380 F.3d at 688.  Courts have found administrative grievance procedures unavailable where an inmate was prevented from filing a grievance.  *See, e.g., Sandlin v. Poole*, 575 F. Supp. 2d 484, 488 (W.D.N.Y. 2008) (The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals . . . effectively rendered the grievance appeal process unavailable to him.").

Second, courts must determine if the defendants are estopped from presenting non-exhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by "'beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility.'"  *Hemphill*, 380 F.3d at 688 (citing *Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir. 2004)).  Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals.  *Murray*, 2010 WL 1235591, at *5 & n.26 (collecting cases); *McCloud v. Tureglio*, No. 07-CV-0650, 2008 WL 1772305, at *12, 2008 U.S. Dist. LEXIS 124388, at *44 (N.D.N.Y. Apr. 15, 2008) (Lowe, M.J.) ("None of those documents allege facts

plausibly suggesting that Defendant's own actions inhibited Plaintiff's exhaustion of remedies during the time in question.").

Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the defendants may not be estopped from asserting a non-exhaustion defense, the inmate's failure to exhaust may be justified.[7] *Hemphill*, 380 F.3d at 686. "Special circumstances" have been found to include an incorrect but reasonable interpretation of DOCCS' regulations or failing to file a grievance in the precise manner prescribed by DOCCS as a result of threats. *See, e.g., Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (failure to exhaust was justified where plaintiff inmate's interpretation of regulations was reasonable and prison official threatened inmate).

## IV. ANALYSIS

### A. Defendants Established the Availability of the Inmate Grievance Program and Plaintiff's Failure to Exhaust Administrative Remedies

Defendants established that an IGP was available to Plaintiff by an administrative process through which inmates could seek an internal review of any complaint regarding the conditions

---

[7] Subsequent to *Hemphill*, the Supreme Court decided *Woodford v. Ngo*, 548 U.S. 81 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 83-84. The Supreme Court resolved the question in the negative, explaining that the PLRA requires "proper exhaustion" – "using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)." *Id.* at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford*, the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews*, 655 F.3d 89, 102-03 (2d Cir. 2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense).

of prison life. (T. at 7-9, 26; *see also* Ex. D-9.) In accordance with the program, an inmate must submit a complaint on a grievance form or on plain paper to the prison staff where the inmate is housed, and staff must attempt to informally resolve the complaint. *Id.* at 36; s*ee also* Ex. D-9. If there is no informal resolution, the IGRC hears the complaint. *Id.* If an inmate is dissatisfied with the decision of the IGRC, the next step is an appeal to the superintendent. *Id.* at 7-9, 26; s*ee also* Ex. D-9. If that request is denied, the inmate must next appeal to CORC. *Id.* If the grievance involves a claim of misconduct by staff, harassment or discrimination, it receives the code of 49. A copy with the grievance number assigned on it goes to the inmate, and the grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility. *Id.* at 15, 27, 34-35. Directive 4040, which sets forth these steps in the inmate grievance process, was identified by Defendants' witnesses as the controlling grievance program document for all DOCCS facilities during the relevant time period. *Id.* at 7, 26; *see also* Ex. D-9.

Inmates learned about the grievance process during orientation at the facility in which they are housed. *Id.* at 45-46. Inmates in the SHU were given a SHU manual during orientation to the SHU which included information about the IGP. *Id.* at 119-120; Ex. D-4 at p. 20. Directive 4040 (Ex. D-9) is available to inmates in facility libraries and inmates in SHU can request a copy and get it. *Id.* at 45-46. Plaintiff was aware of the grievance process and Directive 4040 and had submitted grievances "plenty of times." *Id.* at 69, 93.

The IGP supervisor at Clinton testified that she searched the inmate grievance database at that facility and did not find any grievances filed by Plaintiff during the period of October 2005 through January 2006. *Id.* at 30-31. She specifically did not find any grievance from Plaintiff

regarding an event of November 20, 2005. *Id.* The Director of the IGP for DOCCS searched the DOCCS' Central Office records and did not locate any appeals to CORC submitted by Plaintiff, or any grievances or appeals submitted by Plaintiff at Clinton in November of 2005 concerning any events that may have occurred there during that time. *Id.* at 10; *see also* Ex. D-11. Plaintiff did not have any active or closed appeals on file with CORC. *Id.*; *see* Ex. D-11. However, the February 1, 2006, letter to Plaintiff from Eagan informing Plaintiff he could not refer a grievance directly to CORC was located. *Id.* at 11-12; Ex. D-8.

In his Complaint, Plaintiff alleged that he attempted to exhaust his administrative remedies but that "prison officials hampered and intervened with his filing of a complaint. . . ." (Dkt. No. 1 at ¶ 4.) He testified inconsistently that he gave either two or three grievances to Sergeant "Mano or Manos" who collected the mail, and that the grievances never made it to the mailbox. (T. at 59, 80-83.) He then identified Sergeant "Mano or Manos" as Sergeant Menard at the hearing and indicated the Sergeant ripped up the grievances in front of him without putting them in the mailbox. *Id.* at 57-59, 79, 81-83, 86-87. In his opposition to the motion for summary judgment, Plaintiff indicated he submitted "a grievance" about the November 20, 2005 incident, and that the Sergeant removed it from the mailbox and ripped it up. *Id.* at 84, *see also* Ex. D-14 at ¶ 16. He claimed he was threatened about filing grievances by Sergeant Menard and other unidentified staff members. *Id.* at 78.

Plaintiff did not produce copies of the two or three grievances he said he attempted to submit, but he did produce a handwritten grievance dated November 28, 2005. *See* Ex. P-4. He claimed it was the grievance he tried to submit at Clinton. *Id.* at 69-71, 91-92. Notably, the October 22, 2013, exhaustion hearing was the first time Plaintiff submitted this handwritten

grievance, despite being asked for copies of grievances at his deposition, and in a follow up letter after his deposition. *Id.* at 72-73; Ex. D-13 and D-14. Additionally, even though Plaintiff had been given nine months to respond to Defendants' summary judgment motion which sought dismissal of the Complaint for failure to exhaust administrative remedies, he failed to submit the handwritten grievance (Ex. P-4) in opposition to the motion. *Id.* at 77; Ex. D-14. The handwritten grievance submitted by Plaintiff did not bear any grievance code or grievance number. Ex. P-4.

The Defendants' witness, Lieutenant Menard, testified that all inmates in the SHU at Clinton are provided with writing paper and a mini-pen upon admission, which is consistent with information in the SHU Orientation Manual. *Id.* at 121-122; Ex. D-4 at p. 6. However, Plaintiff testified he was not given a pen or paper at the Clinton SHU and was thus not able to prepare grievances until he obtained writing materials from the inmate next to him. *Id.* at 55-56. Plaintiff claimed to have also obtained carbon copy paper from that inmate and to have made copies of the grievances. However, he had no copies of the two or three grievances he tried to submit. *Id.* at 60-61.

Plaintiff clearly testified he was aware of the grievance process and of Directive 4040. *Id.* at 69. He had submitted grievances "plenty of times." *Id.* at 93. Plaintiff's last minute production of a handwritten grievance (Ex. P-4) is insufficient to credibly show that he attempted to file a grievance concerning the November 20, 2005, incident. Neither the IGP supervisor at Clinton nor the DOCCS' Director of the IGP had any record of a grievance or appeal filed by Plaintiff regarding an event of November 20, 2005. *Id.* at 10, 30-31; *see also* D-11. There was no record of any complaints about his grievances being ripped up or not reaching their

destination, nor did he report any problems with grievances to the IG investigator. *Id.* at 146; *see also* Ex. D-12A and 12B. Plaintiff did not have any active or closed appeals on file with CORC. *Id.* at 10. While the February 1, 2006, letter to Plaintiff from the previous DOCCS' Director of the IGP indicates that Plaintiff wrote to CORC on January 2, 2006, it is clear from the letter that there was no record of a grievance first filed at the facility level. Ex. D-8. Thus, the Court finds that Defendants met their burden of showing that administrative remedies were available to Plaintiff, and that Plaintiff failed to exhaust those remedies. *See Woodford*, 548 U.S. at 90 (the PLRA requires "proper exhaustion" - "using all steps that the agency holds out, and doing so properly so that the agency addressed the issues on the merits.").

### B. Plaintiff's Claims of Unavailability and Special Circumstances

Under the *Hemphill* analysis, the Court now turns to whether Plaintiff has shown exhaustion unavailability or special circumstances. Availability of ordinary grievance procedures is an objective test of whether the similarly situated individual would have deemed them available. *Hemphill*, 380 F.3d at 688. Plaintiff argued at the hearing that he was unable to pursue a grievance because he was not given a pen or paper to prepare a grievance. At the same time, Plaintiff claims that he tried to submit two or three grievances (his testimony was inconsistent), but Sergeant Menard ripped them up when collecting the mail. (T. at 55-59, 79, 81-83, 86-87.)

Plaintiff also testified that he did not attempt to give grievances to any other prison official because he was on the floor of his cell and too weak to get up, or he was threatened by Sergeant Menard. *Id.* at 78, 94-96. Yet he spoke to an investigator from the IG's office and could not recall disclosing that someone was ripping up his grievances. *Id.* at 97, 107-109.

Furthermore, he previously indicated that his "mail may not have reached its destination," not that it was being ripped up. *Id.* at 88; *see also* Ex. D-7.

In contrast, Menard testified that the mail was picked up on a daily basis in the SHU, but that he did not push the mail cart. *Id.* at 120-122,139. Unit counselors made rounds on the SHU every day, and other staff including nurses, chaplains, the grievance supervisor, and executive staff routinely made rounds in the SHU. *Id.* at 131-135. The SHU sign in log book showed that various staff members made visits to the SHU on a regular basis from November 20, 2005, to January 10, 2006. *Id.*; *see also* Ex. D-5. Inmates could give grievances to any of the staff making rounds including executive staff. *Id.* at 135-136. The SHU log book shows that grievance Sergeant Giambruno made rounds there within fourteen days of November 20, 2008, on December 2, 2005. *Id.* at 135; *see also* Ex. D-5.

Brousseau, the Clinton IGP supervisor, also testified that the grievance sergeant makes rounds in the SHU and inmates housed there can report any grievances or problems with the program to that officer. (T. at 48.) She too confirmed that the SHU sign in log book reveals that a grievance office sergeant, Sergeant Giambruno, visited the SHU within fourteen days after the incident of November 20, 2005. *Id.* at 47-48; *see also* Ex. D-5. Additionally, if an investigator from the IG's office is involved in an investigation, an inmate could report any grievance or problems with the grievance program to that investigator. *Id.* at 32.

IG Deputy Miller reviewed the IG's file regarding Plaintiff which revealed an internal affairs investigation regarding the November 20, 2005, incident. *Id.* IG investigator Reichelt interviewed Plaintiff on December 8, 2005, and prepared a report of the interview. *Id.* at 144-145; *see also* Ex. D-12A and D-12B. The SHU log book confirms Reichelt was on the unit from

22

1:55p.m. to 2:20p.m. on that day. Ex. D-5. Reichelt's report does not indicate that Plaintiff complained of grievances being ripped up or destroyed by staff at Clinton. *Id.* at 146; *see also* Ex. D-12A and D-12B. The report indicates Plaintiff was threatened and "embarrassed to say anything before seeing [the investigator]" which implies he had not attempted to file any grievance. Ex. D-12B. If Plaintiff had complained of grievances being destroyed, that allegation would have been added to the investigation, and video of the location where the destruction occurred would have been reviewed for the relevant time and date to see if such destruction was indeed happening. *Id.* at 148. The investigator also looks for any grievances filed at the facility. *Id.* at 146-147.

Clinton legal office clerk Irwin testified that a superintendent/security file is maintained for inmates at Clinton which would contain letters by inmates to the superintendent, and any kind of code 49 investigation documents. *Id.* at 113-114. She searched for a file regarding Plaintiff and found only a copy of a letter to Plaintiff from Eagan dated February 1, 2006; that letter indicates by a stamp that it was received in the superintendent's office on February 6, 2006. *Id.* at 114-115; *see also* Ex. D-8. She did not find any letter from Plaintiff to the superintendent or any other correspondence in the superintendent/security file. *Id.* at 113.

The Court does not find Plaintiff's testimony credible regarding his claims that he was denied writing materials, that he attempted to submit grievances, or that he was too weak to get up off the floor of his cell to report his grievance to other prison officials. His testimony is inconsistent with the record as a whole, as well as with his prior testimony and submissions to the Court in his pleadings and on summary judgment. *See* Dkt. No.1; Ex. D-14. Furthermore, he failed to mention any problem with filing a grievance to the investigator from the IG's office who

clearly spoke to him about the November 20, 2005, incident and that conversation occurred within the fourteen day time frame to file a grievance.

Even if Plaintiff's testimony were credited, in order to prevail on an argument that the grievance procedure was not available to him, or that there were special circumstances because the officials did not file the grievances, Plaintiff must show that he nonetheless followed the grievance procedure through all of the steps in the DOCCS' regulations. *See, e.g., Belile v. Griffin*, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086, at *3-4, 7, 2013 U.S. Dist. LEXIS 47137, at *10, 22-23 (N.D.N.Y. Feb. 12, 2013) (plaintiff failed to exhaust his administrative remedies because he had not followed through on all of the steps, *i.e.*, he did not appeal to the superintendent of the facility or appeal any unfavorable decision of the superintendent to CORC; plaintiff alleged he had filed two grievances by placing the grievances in his meal slot to be filed by corrections officers, but claimed they were intercepted or discarded, and never received a determination on the grievances); *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) ("[P]laintiff's allegation that these particular grievances were misplaced or destroyed by correctional officers ultimately does not relieve him of the requirement to appeal these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming."), *aff'd*, 178 F. App'x 39 (2d Cir. 2006); *Atkins v. Menard*, No. 9:11-CV-0366 (GTS/DEP), 2012 WL 4026840, at *4, 2012 U.S. Dist. LEXIS 130059, *13 (N.D.N.Y. Sept. 12, 2012) (finding that plaintiff failed to exhaust where he had the "ability, and indeed the duty, to appeal the IGRC's nonresponse (to his grievance) to the next level, including CORC, to complete the grievance process."); *Murray v. Palmer*, No. 03-CV-1010, (DNH/GLS), 2008 WL 2522324, at *16, 18, 2008 U.S. Dist. LEXIS 47933 (N.D.N.Y. June 20, 2008) (finding that in order to

24

exhaust available administrative remedies with regard to his grievance, plaintiff had to file an appeal with the superintendent from the IGRC's non-response, which included a failure to acknowledge the receipt of a grievance and assign it a number); *Midalgo v. Bass*, No. 03-CV-1128 (NAM/RFT), 2006 WL 2795332, at *7, 2006 U.S. Dist. LEXIS 98871, at *16-17 (N.D.N.Y. Sept. 26, 2006) (observing that plaintiff was required to seek an appeal to the superintendent, even though he never received a response to his grievance and was not assigned a grievance number); *Gill v. Frawley*, No. 02-CV-1380, 2006 WL 1742738, at *11 & n. 77, 2006 U.S. Dist. LEXIS 41984 (N.D.N.Y. June 22, 2006) (Lowe, M.J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Waters v. Schneider*, No. 01 Civ 5217(SHS), 2002 WL 727025, at *2, 2002 U.S. Dist. LEXIS 7166, at *4-5 (S.D.N.Y. Apr. 23, 2002) (finding that in order to exhaust administrative remedies, plaintiff had to file an appeal with the superintendent from IGRC's non-response to his grievance, of which no record existed). Plaintiff has failed to make that showing.

The superintendent/security file maintained at Clinton did not contain any record of Plaintiff ever submitting a letter to the superintendent. (T. at 113.) Plaintiff initially testified he sent a letter to the superintendent on January 2, 2006, and that it was substantially the same as the letter he sent that very same day to CORC. *Id.* at 64. However, in the letter he sent to CORC on January 2, 2006, which was received by CORC on January 6, 2006, he indicated that he attempted to file with the facility grievance department and the superintendent, but had "not received a response from either office." Ex. D-7. Plaintiff later testified that he sent a letter to

the superintendent sometime between the date of the incident, November 20, 2005, and when he moved to Southport Correctional Facility on January 12, 2006. *Id.* at 90-91; *see also* Ex. D-6. He also acknowledged that he had no documentation to show that he tried to send a grievance to the superintendent before January 2, 2006. *Id.* at 92.

Based upon this testimony and the record as a whole, the Court finds Plaintiff has not plausibly shown, at the very least, that he filed or even attempted to file a grievance with the superintendent of Clinton. Since Plaintiff has not shown he followed all of the steps of the grievance process, he has not properly exhausted his administrative remedies and therefore cannot prevail on his claims of unavailability or special circumstances.

### C.    Plaintiff's Claim of Estoppel

Although Plaintiff has not specifically claimed that Defendants are estopped from raising the exhaustion defense, the court *sua sponte* finds the testimony does not support an estoppel. Plaintiff's testimony is that he gave the grievances to Menard and that he was threatened by Menard. *Id*. at 57-59,78-79. However, there was absolutely no evidence presented showing that the named Defendants in this case threatened Plaintiff, prevented the grievances from being filed, or did not provide Plaintiff with writing materials. As such, Plaintiff has failed to show Defendants should be estopped from asserting Plaintiff failed to exhaust his administrative remedies. *Murray*, 2010 WL 1235591, at *5 & n.26 (collecting cases); *McCloud*, 2008 WL 1772305, at *12 ("None of those documents allege facts plausibly suggesting that Defendant's own actions inhibited Plaintiff's exhaustion of remedies during the time in question.").

### V.    CONCLUSION

Based upon the evidence presented at the hearing, the Court recommends that Plaintiff's

Complaint be dismissed with prejudice and without addressing its merits because an administrative grievance process was available to him and he failed to exhaust those administrative remedies. Plaintiff was not prevented by the actions of prison officials, including the named Defendants, from filing a grievance or from pursuing his administrative remedies, including appealing to the superintendent of the relevant corrections facility and appealing to CORC. He has offered no credible special circumstances to excuse his failure to exhaust administrative remedies.

Where a claim is dismissed for failure to exhaust administrative remedies, dismissal without prejudice is appropriate if the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik*, 366 F.3d 85, 86-87 (2d Cir. 2004). However, if a prisoner has failed to exhaust administrative remedies or provide a valid excuse for failure to do so, and the time in which to exhaust has expired, it is proper for the court to dismiss the complaint with prejudice because any attempt to exhaust would be futile. *Id*. at 86; *see also Hilbert v. Fischer*, No. 12 Civ. 3843 (ER), 2013 WL 4774731, at *7,. LEXIS 126881, at *23-24 (S.D.N.Y. Sept. 4, 2013) (where the time to file a grievance and request an exception to the time limit has long since expired, and plaintiff has failed to establish an excuse for his failure to exhaust, dismissal with prejudice is proper). Because Plaintiff has failed to establish a credible excuse for his failure to exhaust, the Court recommends that the dismissal of his Complaint be with prejudice.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) in this action be **DISMISSED**, with prejudice, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a); and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of all unpublished decisions cited in this Order in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Dated:      April 7, 2014
            Syracuse, NY


_____
Therese Wiley Dancks
United States Magistrate Judge